[ORAL ARGUMENT NOT YET SCHEDULED]
No. 22-5095
_____

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE DISTRICT OF COLUMBIA CITCUIT**
_____

CENTER FOR BIOLOGICAL DIVERSITY,
FRIENDS OF THE EARTH, and
CENTER FOR INTERNATIONAL ENVIRONMENTAL LAW,

*Plaintiffs/Appellants*

v.

UNITED STATES INTERNATIONAL
DEVELOPMENT FINANCE COROPORATION

*Defendant/Appellee*.

On Appeal from the United States District Court
For the District of Columbia
_____

**DEFERRED JOINT APPENDIX**
_____

William J. Snape, III
American University Law School
Center for Biological Diversity
4300 Nebraska Ave, NW
Washington, D.C. 20016
Telephone: (202) 536-9351
wsnape@wcl.american.edu

Margaret A. Coulter
Center for Biological Diversity
1411 K Street, NW
Washington, D.C. 20005
Telephone: (202) 961-4820
mcoulter@biologicaldiversity.org

*Attorneys for Plaintiffs-Appellants*

# TABLE OF CONTENTS

| Document Title | JA Page |
|---|---|
| Order, *Ctr. for Biological Diversity, et al., v. U.S. Dev. Finance Corp.* (D.D.C. Feb. 2, 2022) (No. 21-cv-01491-CRC) (ECF No. 13). | JA-2 |
| Memorandum Opinion, *Ctr. for Biological Diversity, et al., v. U.S. Dev. Finance Corp.* (D.D.C. Feb. 2, 2022) (1:21-cv-01491-CRC) (ECF No. 14). | JA-3 |
| Complaint for Declaratory and Injunctive Relief, *Ctr. for Biological Diversity, et al., v. U.S. Dev. Finance Corp.* (D.D.C. June 2, 2021) (1:21-cv-01491-CRC) (ECF No. 1). | JA-24 |
| Declaration of Sarah Uhlemann, *Ctr. for Biological Diversity, et al., v. U.S. Dev. Finance Corp.* (D.D.C. July 8, 2021) (1:21-cv-01491-CRC) (ECF No. 7-1). | JA-40 |
| Declaration of Kate DeAngelis, *Ctr. for Biological Diversity, et al., v. U.S. Dev. Finance Corp.* (D.D.C. July 8, 2021) (1:21-cv-01491-CRC) (ECF No. 7-2). | JA-44 |
| Declaration of Doug Norlen, *Ctr. for Biological Diversity, et al., v. U.S. Dev. Finance Corp.* (D.D.C. July 8, 2021) (1:21-cv-01491-CRC) (ECF No. 7-3). | JA-51 |
| Declaration of Carla Garcia Zendejas, *Ctr. for Biological Diversity, et al., v. U.S. Dev. Finance Corp.* (D.D.C. July 8, 2021) (1:21-cv-01491-CRC) (ECF No. 7-4). | JA-55 |
| Declaration of William Snape, III, *Ctr. for Biological Diversity, et al., v. U.S. Dev. Finance Corp.* (D.D.C. July 8, 2021) (1:21-cv-01491-CRC) (ECF No. 7). | JA-64 |
| Supplemental Declaration of Kate DeAngelis, *Ctr. for Biological Diversity, et al., v. U.S. Dev. Finance Corp.* (D.D.C. Dec. 15, 2021) (1:21-cv-01491-CRC) (ECF No. 12-1). | JA-66 |

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **CENTER FOR BIOLOGICAL DIVERSITY,** et al., <br><br> Plaintiffs, <br><br> v. <br><br> **U.S. INTERNATIONAL DEVELOPMENT FINANCE CORP.,** <br><br> Defendant. | Case No. 21-cv-1491 (CRC) |

## <u>ORDER</u>

For the reasons stated in the accompanying Memorandum Opinion, it is hereby

**ORDERED** that [8] Defendants' Motion to Dismiss is GRANTED.

This is a final appealable order.

**SO ORDERED**.


_____
CHRISTOPHER R. COOPER
United States District Judge

Date:  <u>February 11, 2022</u>

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **CENTER FOR BIOLOGICAL DIVERSITY,** et al., <br><br> Plaintiffs, <br><br> v. <br><br> **U.S. INTERNATIONAL DEVELOPMENT FINANCE CORP.,** <br><br> Defendant. | Case No. 21-cv-1491 (CRC) |

## MEMORANDUM OPINION

The Government in the Sunshine Act ("Sunshine Act") requires that every meeting of a covered "agency" be conducted in public, with a handful of exceptions. 5 U.S.C. § 552b. In April 2020, the U.S. International Development Finance Corporation ("DFC") published a rule, without notice and comment, exempting itself from the Sunshine Act and has since declined to notice and hold public meetings as the Act would require. See Sunshine Act Exemption Regulation, 85 Fed. Reg. 20,423 (Apr. 13, 2020) (the "Sunshine Act Rule"). Plaintiffs, three non-profit organizations that monitor the environmental effects of DFC projects, have challenged the rule under the Administrative Procedure Act ("APA") and the Sunshine Act itself.

Plaintiffs seek an order declaring the DFC subject to the Sunshine Act and enjoining the agency from conducting further meetings out of the public eye. The DFC has moved to dismiss plaintiffs' complaint for lack of standing under Federal Rule of Civil Procedure 12(b)(1) and for failure to state a claim under Rule 12(b)(6). Finding that plaintiffs have established informational standing but that the DFC does not meet the Sunshine Act's definition of an "agency," the Court will grant the DFC's motion to dismiss under Rule 12(b)(6).

## I.   Background

### A.  The Sunshine Act

"Congress enacted the Sunshine Act to open the deliberations of multi-member federal agencies to public view."  Common Cause v. Nuclear Reg. Comm'n, 674 F.2d 921, 928 (D.C. Cir. 1982).  The Act is "founded on the proposition that the government should conduct the public's business in public."  Compl. ¶ 24 (citing S. Rep. No. 354, 94th Cong., 1st Sess. 1; Conf. Rep. No. 1178, 94th Cong., 2d Sess. 9 (1976), *reprinted in* 1976 U.S. Code Cong. & Admin. News 2183, 2245).  The Act thus requires covered agencies to hold meetings "open to public observation," with certain exceptions.  5 U.S.C. § 552b(b).  They must also publicly announce the time, place, and subject matter of meetings at least a week in advance, id. § 552b(e)(1), and prepare a complete transcript or electronic recording of meetings that are closed for any reason, id. § 552b(f).  The term "agency" in the Sunshine Act means "any agency . . . headed by a collegial body composed of two or more individual members, a majority of whom are appointed to such position by the President with the advice and consent of the Senate."  Id. § 552b(a)(1).

### B.  History of OPIC and the DFC

The DFC was created by statute in 2018.  See Better Utilization of Investments Leading to Development Act, P.L. 115-254, 132 Stat. 3485 (Oct. 5, 2018) (codified at 22 U.S.C. § 9612) (the "BUILD Act").  Its mission is to facilitate private financing of international development projects in poorer countries, consistent with the foreign policy objectives of the United States.  Compl. ¶¶ 15, 16.

The DFC's predecessor agency was the Overseas Private Investment Corporation ("OPIC").  OPIC met the definition of an "agency" under the Sunshine Act because a majority (eight) of its fifteen board members were "appointed by the President of the United States, by

and with the advice and consent of the Senate." 22 U.S.C. § 2193(b) (repealed).  The President

of OPIC was the ninth board member, and the remaining six members were other United States

officers, such as the United States Trade Representative.  Id. § 2193(c).  Accordingly, OPIC was

subject to the Sunshine Act and complied with it until OPIC was replaced with the DFC by

statute.  See, e.g., 84 Fed. Reg. 6839–40 (Feb. 28, 2019) (Notice of OPIC Sunshine Act

meeting).

The DFC has a nine-member board of directors.  It includes: (a) the Chief Executive

Officer of the DFC; (b) four officers from other government agencies; and (c) four other

individuals appointed directly to the board by the President, with the advice and consent of the

Senate.  22 U.S.C. § 9613(b)(2)(A).  The four officers from other agencies are: the Secretary of

State, the Administrator of the United States Agency for International Development, the

Secretary of the Treasury, and the Secretary of Commerce (or their respective designees).  Id.

§ 9613(b)(2)(B).

The BUILD Act also provides that the Chief Executive Officer of the DFC be nominated

by the President with the advice and consent of the Senate.  Id. § 9613(d)(1).  The CEO is

"responsible for the management of the Corporation and shall exercise the powers and discharge

the duties of the Corporation subject to the bylaws, rules, regulations, and procedures established

by the Board," of which the CEO is a part.  Id. § 9613(d)(2); see Compl. ¶ 11–13.

On April 13, 2020, DFC published a rule exempting itself from the Sunshine Act

because, in its view, it did not meet the Act's definition of an "agency."  Compl. ¶ 42.  The DFC

did not issue a proposed rule prior to publishing the final rule, and the rule did not go through

APA notice and comment procedures.  Compl. ¶ 43.  Since that change, the DFC has conducted

meetings without following the requirements of the Sunshine Act.  Compl. ¶¶ 46–47, 57.

C.   Plaintiffs' Participation in OPIC and DFC Meetings

Plaintiffs are three non-profit organizations, the Center for Biological Diversity ("CBD" or "the Center"), Friends of the Earth ("FOE"), and the Center for International Environmental Law ("CIEL"). All three groups monitor the environment and endangered species, both in the United States and abroad. They also engage in advocacy and educational outreach related to their goals of protecting the environment and maintaining biological diversity. Compl. ¶¶ 5–7.

According to several declarations submitted by plaintiffs, prior to the DFC's creation in 2018, staff and members of all three attended OPIC meetings and engaged with OPIC in connection with its overseas projects. Compl. ¶¶ 5–7; see also Uhlemann Decl., ECF No. 7-1; DeAngelis Decl., ECF No. 7-2; Norlen Decl., ECF No. 7-3; Zendejas Decl., ECF No. 7-4.[1] This participation furthered plaintiffs' work monitoring the potential impact of OPIC projects on federally endangered species. Compl. ¶¶ 5–7. Plaintiffs say that access to OPIC meetings and records pursuant to the Sunshine Act facilitated this participation. For example, when OPIC existed, staff from the Center for Biological Diversity "relied on Federal Register notices of meetings, minutes of meetings, transcripts of meetings, and records of meetings." Uhlemann Decl. ¶ 7. This information "allowed Center staff to monitor the workings of OPIC and participate more effectively in the agency's decision-making process." Id. The Center submitted comments on OPIC projects in 2017 and 2018. Id. ¶¶ 8–9. Similarly, staff from Friends of the Earth presented at public OPIC meetings throughout 2017 and 2018. DeAngelis Decl. ¶¶ 4–5.

---

[1] The Court notes here that the government objects to its consideration of these declarations at this stage. See Mot. to Dismiss at 9–10, ECF No. 8. For the reasons explained below, the Court will consider the content of the declarations in deciding defendant's motion to dismiss under Rule 12(b)(1).

Plaintiffs allege that the DFC's Sunshine Act exemption deprives them of timely information about the agency's projects and activities.  Compl. ¶¶ 5–7.  They insist that the exemption has already hampered their ability to interact with the DFC.  For example, plaintiffs allege that on September 9, 2020, the DFC held a private board meeting at which the board voted to approve funds for the Rovuma Liquified Natural Gas project in northern Mozambique.  Norlen Decl. ¶ 7.  Doug Norlen, Director of FOE's Economic Policy Program, attests that he has tracked this project since 2015, but was unable to participate in the meeting or provide comments because it was not noticed in the federal register in advance—Mr. Norlen only learned of the meeting on the day it was scheduled to occur.  Id.; see also, e.g., Zendejas Decl. ¶ 18 (lack of public access has impaired CIEL's ability to track the Alto Maipo Project in Chile); Supp. DeAngelis Decl. ¶¶ 8–9, ECF No. 12-1 (noting approval of two projects in India and Sierra Leone at a private DFC Board meeting held on December 8, 2021).

## II.   Legal Standards

### A.  Motion to Dismiss

When analyzing a motion to dismiss under either Rule 12(b)(1) or 12(b)(6), a court "must treat the complaint's factual allegations as true, and must grant plaintiff the 'benefit of all inferences that can be derived from the facts alleged.'"  Sparrow v. United Air Lines, Inc., 216 F.3d 1111, 1113 (D.C. Cir. 2000) (quoting Schuler v. United States, 617 F.2d 605, 608 (D.C. Cir. 1979)).

A motion under Rule 12(b)(1) "'presents a threshold challenge to a court's jurisdiction.'"  Ctr. for Biological Diversity v. Jackson, 815 F. Supp. 2d 85, 89 (D.D.C. 2011) (quoting Haase v. Sessions, 835 F.2d 902, 906 (D.C. Cir. 1987)).  The plaintiff "bears the burden of proving by a preponderance of the evidence that the Court has subject-matter jurisdiction over her claims."

Schmidt v. U.S. Capitol Police Bd., 826 F. Supp. 2d 59, 69 (D.D.C. 2011) (citing Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992)).  When reviewing a challenge under Rule 12(b)(1), "the court may consider documents outside the pleadings to assure itself that it has jurisdiction."  Sandoval v. U.S. Dep't of Justice, 322 F. Supp. 3d 101, 104 (D.D.C. 2018) (Cooper, J.).

One core aspect of subject matter jurisdiction is standing—i.e., that the plaintiff has suffered an "injury in fact" that is (1) "actual or imminent," (2) "fairly traceable to the challenged action of the defendant," and (3) capable of being "redressed by a favorable decision."  Lujan, 504 U.S. at 560–61.  "[S]tanding is an essential and unchanging part of the case-or-controversy requirement of Article III."  Id.  As relevant here, plaintiff can establish an informational injury sufficient for standing by demonstrating a denial of access to information "where a statute (on the claimants' reading) requires that the information be publicly disclosed and there is no reason to doubt . . . that the information would help them."  Campaign Legal Ctr. & Democracy 21 v. FEC, 952 F.3d 352, 356 (D.C. Cir. 2020) (internal quotation marks omitted).

In contrast to a motion under Rule 12(b)(1), "[a] Rule 12(b)(6) motion tests the legal sufficiency of a complaint: dismissal is inappropriate unless the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."  Browning v. Clinton, 292 F.3d 235, 242 (D.C. Cir. 2002) (internal quotation marks omitted).  Under Rule 12(b)(6), "a court may ordinarily consider only 'the facts alleged in the complaint, documents attached as exhibits or incorporated by reference in the complaint[,] and matters about which the Court may take judicial notice.'"  Sandoval, 322 F. Supp. 3d at 104 (quoting Gustave–Schmidt v. Chao, 226 F. Supp. 2d 191, 196 (D.D.C. 2002)).

### III.   Analysis

A.   <u>Standing</u>

*1.   The Court Will Consider Plaintiffs' Declarations*

Before turning to standing, the Court must first tackle the government's objection to considering plaintiffs' declarations.  As noted above, plaintiffs filed four declarations from staff members at their organizations attesting to their past participation before OPIC and describing how the DFC's failure to notice meetings has impaired their ability to monitor various projects and participate in the meetings as they used to do.  <u>See</u> Uhlemann Decl.; DeAngelis Decl.; Norlen Decl.; Zendejas Decl.  Plaintiffs first filed these declarations as stand-alone documents, then refiled them as attachments to their memorandum in opposition to DFC's motion to dismiss. <u>See</u> Mem. in Opp'n, ECF No. 10, Exs. 1-12.

The government suggests that because its Rule 12(b)(1) motion raises a "facial" challenge to jurisdiction, the Court may not look beyond the four corners of the complaint to consider the declarations.  Mot. to Dismiss at 9, ECF No. 8.  The government separately argues that the Court should ignore the declarations because they "were not attached to any proper filing," and plaintiffs have not amended their complaint to incorporate the declarations or their contents.  <u>Id.</u>  The Court is not persuaded by either argument.

First, it is well established that the Court may look to materials beyond the pleadings when considering a 12(b)(1) motion to assure itself of jurisdiction, including additional declarations or affidavits provided by a plaintiff to support standing.  "As the D.C. Circuit has explained, in resolving a motion to dismiss for lack of subject-matter jurisdiction under Rule 12(b)(1), the court is not limited to the allegations contained in the complaint but may consider materials outside the pleadings."  <u>Marsh v. Johnson</u>, 263 F. Supp. 2d 49, 54 (D.D.C. 2003).

Because a 12(b)(1) challenge goes to the court's subject matter jurisdiction, "it has been long

accepted [in 12(b)(1) proceedings] that the judiciary may make appropriate inquiry beyond the

pleadings to satisfy itself on [its] authority to entertain the case." Haase, 835 F.2d at 906

(internal quotation marks omitted); see also Warth v. Seldin, 422 U.S. 490, 501 (1975) ("For

purposes of ruling on a motion to dismiss for want of standing . . . it is within the trial court's

power to allow or to require the plaintiff to supply, by amendment to the complaint or by

affidavits, further particularized allegations of fact deemed supportive of plaintiff's standing.");

Jerome Stevens Pharm., Inc. v. FDA, 402 F.3d 1249, 1253 (D.C. Cir. 2005) ("[T]he district court

may consider materials outside the pleadings in deciding whether to grant a motion to dismiss for

lack of jurisdiction.").

     The Court is unaware of any precedent supporting the idea that a 12(b)(1) motion must be

limited to the pleadings, and fellow courts in this district routinely consider associated affidavits

or exhibits when deciding a motion under Rule 12(b)(1). See, e.g., Vanover v. Hantman, 77 F.

Supp. 2d 91, 98 (D.D.C. 1999) ("[A] document attached to the motion papers may be considered

without converting the [12(b)(1)] motion to one for summary judgment."); Marsh, 263 F. Supp.

2d at 54 (granting leave to file two supplemental declarations in response to 12(b)(1) motion);

Dvorak v. U.S. Dep't of Homeland Sec., No. 18-CV-1941, 2019 WL 1491743, at *1 (D.D.C.

Apr. 3, 2019) (relying on declarations to find the action moot and dismiss the case); Ctr. for

Biological Diversity v. Bernhardt, 442 F. Supp. 3d 97, 103–04 (D.D.C. 2020) (quoting Warth,

422 U.S. at 501).

     The Court is equally unconvinced by the government's contention that its choice to bring

a "facial" challenge to standing somehow limits the Court's ability to consider material outside

the pleadings. The government relies on two cases that distinguish between so-called "facial"

and "factual" challenges to jurisdiction, <u>Phoenix Consulting v. Republic of Angola</u>, 216 F.3d 36, 40 (D.C. Cir. 2000), and <u>Feldman v. Fed. Deposit Ins. Corp.</u>, 879 F.3d 347, 351 (D.C. Cir. 2018). Neither case says a Court *cannot* consider declarations or affidavits outside the pleadings when deciding a Rule 12(b)(1) motion.  Rather, the distinction drawn in these cases concerns how the Court should treat the plaintiff's alleged factual basis for standing.  In a facial challenge, the defendant simply asserts that the facts as pleaded are not sufficient for standing.  When presented with evidence that contradicts the plaintiff's alleged facts, however, the Court can go beyond the pleadings to resolve a disputed fact *against* the plaintiff.  As the D.C. Circuit explained in <u>Feldman</u>: "Where a motion to dismiss a complaint present[s] a dispute over the factual basis of the court's subject matter jurisdiction . . . the court must go beyond the pleadings and resolve any disputed issues of fact the resolution of which is necessary to a ruling upon the motion to dismiss." <u>Feldman</u>, 879 F.3d at 351 (internal quotation marks omitted); <u>see also</u> <u>Phoenix Consulting</u>, 216 F.3d at 40.

Neither case says that on a facial challenge the Court must rely solely on the complaint and cannot consider materials outside the pleadings supplied by the plaintiff.  And at least one judge in this district has said the exact opposite: "The court may look beyond the allegations contained in the complaint to decide a facial challenge, as long as it still accepts the factual allegations in the complaint as true." <u>Lindsey v. United States</u>, 448 F. Supp. 2d 37, 43 (D.D.C. 2006) (internal quotation marks omitted).

As for the government's second argument, the Court sees no obvious impediment to considering jurisdictional declarations filed as stand-alone documents.  But, plaintiffs re-filed their declarations as attachments to their opposition brief in any event.  This is certainly proper. <u>Vanover</u>, 77 F. Supp. 2d at 98 ("[A] document attached to the motion papers may be considered

without converting the [12(b)(1)] motion to one for summary judgment."). Seeing no procedural bar to considering the declarations, the Court will do so.

### 2. *Plaintiffs Have Alleged an Informational Injury*

To establish informational injury, a "plaintiff [must] show that (1) it has been deprived of information that, on its interpretation, a statute requires the government or a third party to disclose to it, and (2) it suffers, by being denied access to that information, the type of harm Congress sought to prevent by requiring disclosure." Elec. Priv. Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity, 878 F.3d 371, 378 (D.C. Cir. 2017) ("EPIC"). Plaintiffs contend that they have standing because they have been "denied . . . notice, information, and materials" that the DFC would be required to make public under the Sunshine Act.  Opp. at 7.  Specifically, plaintiffs have identified several DFC meetings that were held without Sunshine Act notice, which would have included the date and time of the meeting and the agenda.  See, e.g., Compl. ¶ 57 (December 1, 2020 and March 9, 2021 meetings); DeAngelis Decl. ¶ 8 (September 9, 2020 meeting).  They have also noted specific deliberations relevant to their work that took place at these meetings.  DeAngelis Decl. ¶ 8 (noting board vote on the Rovuma LNG project in Mozambique); Supp. DeAngelis Decl. ¶¶ 8–9 (noting that a $250 million loan for a vehicle finance program in India was approved at the December 8, 2021 meeting).  Plaintiffs have further averred that they were unable to attend the meetings due to the deficient notice.  Id.  And, on plaintiffs' read, the DFC is subject to the Sunshine Act.

Plaintiffs' allegations and averments are more than enough to establish informational standing.  Plaintiffs have alleged a right under the Sunshine Act to obtain the information they seek, a specific denial of that right by the agency, and a resulting injury flowing from the denial. That suffices.  See Elec. Power Supply Ass'n v. F.E.R.C., 391 F.3d 1255, 1262 (D.C. Cir. 2004)

(finding that a power company association had standing to challenge a FERC rule modifying the

agency's Sunshine Act regulations because the association and its members regularly

participated in FERC hearings and sought to enforce a procedural right under the Sunshine Act);

Waterkeeper Alliance v. Env't Prot. Agency, 853 F.3d 527, 533 (D.C. Cir. 2017) (finding

informational standing where agency rule curtailing CERCLA reporting requirements deprived

environmental organizations of information which they previously had a statutory right to

access).

The government does not contest plaintiffs' representations that they have been deprived

of information that would be required in a Sunshine Act notice and that the lack of such

information has impeded their organizational goals.  Its only rejoinder to the plaintiffs'

informational standing argument is that "plaintiffs have not alleged that they requested and were

denied access to government records or meetings."  Mot. at 8.  In the government's view,

plaintiffs must ask to attend specific DFC meetings, or request the minutes and transcript after

the fact, and have their requests denied in order to establish standing.

This argument falls far short of the mark.  The elements of informational standing laid

out above do not require plaintiffs to lodge a specific request for information; they only have to

allege a deprivation of information required to be disclosed by statute, which plaintiffs have done

here.  Consistent with that requirement, the D.C. Circuit has upheld informational standing in

similar situations without requiring an advance information request.  Elec. Power Supply Ass'n.,

391 F.3d at 1262; Waterkeeper, 853 F.3d at 533; see also, e.g., Friends of Animals v. Jewell, 824

F.3d 1033, 1041 (D.C. Cir. 2016) (non-profit organization had informational standing under

§ 10(c) of the Endangered Species Act, which required the Secretary of the Interior to publish

notice of each application for an exemption or permit under the Act); United to Protect

Democracy, 288 F. Supp. 3d at 107 (voting rights group had standing to challenge lack of

disclosure under the Paperwork Reduction Act, which required notice in the federal register

before the government made a request for voter data).

The government cites two cases involving the Freedom of Information Act ("FOIA") for

the existence of an affirmative-request requirement for informational standing, but neither

imposes that additional hurdle in all cases.  In the first case, Prisology, Inc. v. Fed. Bureau of

Prisons, 852 F.3d 1114 (D.C. Cir. 2017); Mot. at 8, a criminal justice reform organization

challenged the Bureau of Prisons' failure to electronically disclose numerous types of reports and

other records.  The plaintiff claimed an informational injury under FOIA.  The D.C. Circuit

rejected standing, finding that the plaintiff had suffered no injury because it did not lodge a

request for the challenged records before bringing suit as FOIA requires, and therefore had no

legal right to the disclosures it sought.  Prisology, 852 F.3d at 1117.  By contrast, plaintiffs here

would have a legal right to disclosure under the Sunshine Act should the Act apply to the DFC.

The government's second case, Union of Concerned Scientists v. U. S. Dep't of Energy,

998 F.3d 926 (D.C. Cir. 2021), presented an APA challenge to a Department of Energy rule

exempting certain information from FOIA.  Again rejecting standing, the Circuit held that

because the plaintiff had not been denied specific records after making a FOIA request, its claim

of injury based on how the agency might exercise its discretion to response to future FOIA

requests was unduly speculative.  Id. at 930.  But one need not speculate about plaintiffs'

claimed injury here.  As noted above, plaintiffs have identified specific information that they

claim the DFC was required to disclose under the Sunshine Act.

The other requirements for informational standing are also met.  The Sunshine Act is an

open-government law.  Its very goal is "to open the deliberations of . . . federal agencies to

public view."  Compl. ¶ 24 (quoting <u>Common Cause</u>, 674 F.2d at 928.  Plaintiffs have

established that, by being denied advance notice of the DFC's meetings, they have suffered

precisely "the type of harm Congress sought to prevent by requiring disclosure."  <u>EPIC</u>, 878 F.3d

at 378.

Plaintiffs' claimed injury is also sufficiently imminent and concrete.  Like the plaintiffs in

<u>Friends of Animals</u>, plaintiffs here allege that the information they seek would help them

"meaningfully participate" in the agency's process and "engage in related advocacy efforts."

<u>Friends of Animals</u>, 824 F.3d at 1041.  They have provided specific examples of how they

participated in open meetings in the past, and how the lack of notice under the Sunshine Act

makes it more difficult for them to do so now.  <u>E.g.</u>, Norlen Decl. ¶ 7.  They have further

identified specific DFC meetings to which they were effectively denied access due to deficient

Sunshine Act notice.  "Given [plaintiffs'] goals and organizational activities, there is no reason to

doubt [their] standing here."  <u>Friends of Animals</u>, 824 F.3d at 1041.

For those reasons, the Court finds that plaintiffs have standing and the Court has subject

matter jurisdiction.  It will therefore proceed to consider the merits of the motion to dismiss.

B.  <u>The Merits</u>

Plaintiffs bring three claims against the DFC.  The first is that the agency violated the

APA by failing to put the Sunshine Act Rule through notice and comment procedures.  Compl.

¶¶ 58–61.  Plaintiffs bring their second and third claims under the both the APA and the

Sunshine Act.  The second alleges that the DFC's Sunshine Act Rule is "arbitrary, capricious, an

abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. §§ 552b(a), (b); 706(2).

The third alleges that the DFC's failure to promulgate Sunshine Act regulations constitutes

agency action "unlawfully withheld and unreasonably delayed." Id. §§ 552b(b), (j), (k); 706(1). Compl. ¶¶ 61–71.  The Court will move in order.

### 1.   APA Claim

Plaintiffs allege in their first claim that the DFC violated the APA by failing to subject the Sunshine Act Rule to notice and comment before issuing it.  Compl. ¶¶ 58–61; see also 5 U.S.C. § 553.  The government's response is threefold: *first*, that plaintiffs cannot bring an APA claim because the Sunshine Act already provides an adequate remedy, Mot. at 11, *second*, that notice and comment was not required because the Sunshine Act Rule is not a "legislative" rule, Mot. at 12, and *third*, that even if notice and comment was required, the DFC's failure to provide it was harmless, Mot. at 14.

An agency is generally required to put a rule through the APA notice and comment process before issuing it.  5 U.S.C. § 553.  The APA provides three exemptions from this requirement, for: "(1) interpretative rules; (2) general statements of policy; and (3) rules of agency organization, procedure, or practice." Mendoza v. Perez, 754 F.3d 1002, 1020–21 (D.C. Cir. 2014); see also Elec. Priv. Info. Ctr. v. U.S. Dep't of Homeland Sec., 653 F.3d 1, 5 (D.C. Cir. 2011).  These exceptions are to be "narrowly construed and only reluctantly countenanced." Am. Hosp. Ass'n v. Bowen, 834 F.2d 1037, 1044 (D.C. Cir. 1987).

The D.C. Circuit has explained that the "critical feature" of a procedural rule is that it covers "agency actions that do not themselves alter the rights or interests of parties, although it may alter the manner in which parties present themselves or their viewpoints to the agency." Bowen, 834 F.2d at 1047 (quoting Batterton v. Marshall, 648 F.2d 694, 703 (D.C. Cir. 1980)); see also Nat'l Min. Ass'n v. McCarthy, 758 F.3d 243, 250 (D.C. Cir. 2014).  In contrast, a "legislative rule" that must go through notice and comment "is one that has legal effect or,

alternately, one that an agency promulgates with the intent to exercise its delegated legislative power by speaking with the force of law." Nat. Res. Def. Council v. Wheeler, 955 F.3d 68, 83 (D.C. Cir. 2020) (internal quotation marks omitted). That being said, "[t]he distinction between those agency pronouncements subject to APA notice-and-comment requirements and those that are exempt has been aptly described as 'enshrouded in considerable smog.'" Am. Min. Cong. v. Mine Safety & Health Admin., 995 F.2d 1106, 1108 (D.C. Cir. 1993); see also JEM Broad. Co. v. F.C.C., 22 F.3d 320, 326 (D.C. Cir. 1994) ("[I]n applying this provision we have struggled with the distinction between 'substantive' and 'procedural' rules.").

Plaintiffs argue the Sunshine Act Rule "does much more than 'merely alter the manner in which the parties present themselves or their viewpoints to the agency.'" Opp. at 21 (citing McCarthy, 758 F.3d at 250). Rather, plaintiffs say the rule "had the effect of altering the legal rights of the public," making it a legislative rule. Opp. at 20. The government rejoins that the rule only modifies "how the agency will conduct proceedings" and thus does not affect the plaintiffs' legal rights. Mot. at 13.

The Court finds neither of the parties' arguments particularly elucidating, because in some sense, the Sunshine Act Rule meets both definitions. In the most literal sense, the rule does "alter the rights" of the public—the public had a statutory right to receive notice and attend DFC meetings before the rule was issued and the rule extinguished that right. And this wholesale elimination of procedural rights under the Sunshine Act is more significant than the more interpretative and discretionary administrative changes at issue in the cases cited by the government. See, e.g., Pub. Citizen v. Dep't of State, 276 F.3d 634, 641 (D.C. Cir. 2002) (rule limiting cut-off date for searches under FOIA requests was procedural). On the other hand, the rule clearly deals with how "the parties present themselves or their viewpoints to the agency,"

the hallmark of a procedural rule.  McCarthy, 758 F.3d at 250 (internal quotation marks omitted).

Neither side presents caselaw that squarely answers whether a rule exempting an agency from

the Sunshine Act falls on one side of this line or the other.

Rather than wade into these uncharted waters, the Court will resolve this claim on the

basis of the government's third argument: that even if notice and comment was required, the

DFC's failure to provide it was harmless.

"'In administrative law, as in federal civil and criminal litigation, there is a harmless error

rule.'"  Nat'l Ass'n of Home Builders v. Defs. of Wildlife, 551 U.S. 644, 659–60 (2007)

(quoting PDK Labs. Inc. v. U. S. Drug Enforcement Admin., 362 F.3d 786, 799 (D.C. Cir.

2004)).  The D.C. Circuit has established a high bar for harmlessness in the APA context: "[A]n

utter failure to comply with notice and comment cannot be considered harmless if there is any

uncertainty at all as to the effect of that failure."  Sprint Corp. v. F.C.C., 315 F.3d 369, 376 (D.C.

Cir. 2003) (internal quotation marks omitted).

For the reasons explained below, the Court agrees with the DFC that it does not meet the

definition of an 'agency' in the Sunshine Act.  This conclusion is compelled by the language of

the two statutes at issue and binding D.C. Circuit precedent.  See 5 U.S.C. § 552b(a)(1) (defining

"agency" subject to the Act); 22 U.S.C. § 9613(b)(2) (setting forth the composition of DFC's

board); see also Symons v. Chrysler Corp. Loan Guarantee Bd., 670 F.2d 238, 240–41 (D.C. Cir.

1981).  The DFC's conclusion was essentially preordained by Congress—Congress wrote the

definition of 'agency' in the Sunshine Act and the provisions of the BUILD Act creating the

DFC.  The Court is not convinced that the information plaintiffs claim they would have shared in

the notice and comment process—"as to the importance of public meetings, like those held by

OPIC,"  Opp. at 23—could have had any impact on the legal conclusion the DFC made.  In this

instance, where all the agency *can* do is rescind an outdated rule, failure to go through notice and comment was harmless.  See Beverly Health & Rehab. Servs., Inc. v. Thompson, 223 F. Supp. 2d 73, 105 (D.D.C. 2002) ("[W]here Congress enacts a new statute or amends an existing one, administrative regulations may be rendered unnecessary or obsolete and the prior regulations need not be repealed by notice and comment."); see also Ass'n of Am. Physicians & Surgeons v. Sebelius, 746 F.3d 468, 472 (D.C. Cir. 2014) (when "the statute itself" foreclosed the plaintiffs' position, "all the procedure in the world" could not lead the agency to a different conclusion).

Accordingly, DFC's failure to provide notice and comment was harmless and the Court will therefore grant DFC's motion to dismiss as to Claim One for failure to state a claim.

### 2. *Sunshine Act Claims*

As explained above, if the DFC is subject to the Sunshine Act, the Act provides a remedy for the DFC's failure to promulgate Sunshine Act regulations.  Claim Two alleges the Sunshine Act Rule is contrary to law under the APA.  Claim Three alleges the DFC failed to promulgate rules under the Sunshine Act.  Although Claim Two is styled under the APA, both claims ask for essentially the same things—that the Court find the DFC covered by the Sunshine Act, that it vacate the rule as contrary to law, and that it order the DFC to promulgate Sunshine Act rules. The Court will therefore consider the claims in tandem.

To be an "agency" subject to the Sunshine Act, the agency must be "headed by a collegial body composed of two or more individual members, a majority of whom are appointed to such position by the President and with the advice and consent of the Senate."  5 U.S.C. § 552b(a)(1).  The DFC board of directors has nine members.  Four members are appointed directly to the board by the President.  22 U.S.C. § 9613(b)(2)(A)(iii).  Four other members are officers from other agencies—the Secretary of State, the Administrator of USAID, the Secretary

of the Treasury, and the Secretary of Commerce (or their designees).  Id. § 9613(b)(2)(B)(i).  The

final board member is the CEO of the DFC.  Id. § 9613(b)(2)(A)(i).

The parties agree that the four board members appointed directly to the Board are

"appointed to such position" and count for Sunshine Act purposes.  See Mot. at 15; Compl. ¶ 11.

They also agree that the four officials from other agencies serve by virtue of their separate

appointments, and therefore do not count for Sunshine Act purposes.  Opp. at 27; Mot. at 16.

The only dispute is whether or not the CEO of the DFC is appointed to the DFC's board "by the

President and with the advice and consent of the Senate."  See Opp. at 27.

Forty years ago, in Symons v. Chrysler Corp. Loan Guarantee Bd., the D.C. Circuit

considered whether the Chrysler Corporation Loan Guarantee Board was an "agency" subject to

the Sunshine Act.  Symons, 670 F.2d 238, 240–41 (D.C. Cir. 1981).  The members of that board

all served by virtue of their appointment to other positions: "The Secretary of the Treasury

chair[ed] the Board; the Chairman of the Board of Governors of the Federal Reserve System and

the Comptroller General of the United States [were] the other voting members, while the

Secretaries of Labor and Transportation serve[d] as nonvoting members of the Board."  Id. at

240.  Because all the board members served "by virtue of the other offices they hold," the Circuit

held they were not "appointed to such position"—i.e., the board position—and therefore the

board was not an agency subject to the Sunshine Act.  Id. at 241, 245.

The government maintains that this reasoning applies to the CEO of the DFC with equal

force.  Mot. at 16.  In its view, the DFC's CEO does not count towards the Sunshine Act's

majority requirement because the CEO is not appointed to his board position, but instead serves

on the board by virtue of his status as the CEO.  Id.  Plaintiffs attempt to distinguish Symons in

two respects.  First, they point out that unlike the statute that created the board at issue in

Symons, the DFC's organic statute does not group the CEO in the same roman numeral with the four other ex-officio members.  Second, they posit that the DFC CEO should be treated differently than the ex-officio board members in Symons (and those here) "because the CEO is being nominated and confirmed to the agency's board only because he is CEO of that exact same agency."  Opp. at 27, 28.

The distinctions drawn by plaintiffs do not affect Symons' application to this case.  The key framing in Symons was whether the board members were appointed *to the Board itself* by the President or, rather, served on the board by virtue of their appointment *to another position*. Symons, 670 F.2d at 241.  This dichotomy applies here even though the DFC's CEO is not listed in the same paragraph of the governing statute as the other ex-officio members.  See 22 U.S.C. § 9613(b).  As to plaintiff's second point, while the CEO of the DFC is not external to his own agency, he still serves on the Board by virtue of his appointment to *another position*—that is, the position of CEO.  See id. § 9613(d)(1) ("There shall be in the Corporation a Chief Executive Officer, who shall be appointed by the President, by and with the advice and consent of the Senate, and who shall serve at the pleasure of the President.").  Symons' reasoning and resulting holding therefore remain binding on this Court.

Plaintiffs also highlight the many similarities between OPIC's organic statute, 22 U.S.C. § 2193(c), and the DFC statute, as evidence that Congress did not intend to exempt the DFC from the Sunshine Act.  For example, neither statute explicitly mentioned the Sunshine Act, and the OPIC chief executive also served on the OPIC board.  See 22 U.S.C. § 2193(c) (repealed). But plaintiffs elide one crucial difference: a majority of the OPIC directors (eight out of fifteen) were "appointed by the President of the United States, by and with the advice and consent of the Senate," and could "not be officials or employees of the Government of the United States."  Id.

§ 2193(b) (repealed).  By contrast, only a minority of the DFC's directors (four out of nine) are so appointed.

Plaintiffs further argue that there is no evidence from the BUILD Act's legislative history that Congress intended to change the DFC's Sunshine Act status when it created the agency in place of OPIC.  See Uhlemann Decl. ¶ 5–7.  The Court has reviewed the congressional record and the committee report on the bill.  As plaintiffs note, there seems to be no mention of the Sunshine Act in the legislative history, or any indication that the sponsors of the bill intended to exempt the DFC from the Sunshine Act.  See, e.g., 164 Cong. Rec. 120, H6320-6333 (July 17, 2018); H.R. Rep. No. 115-814 (2018) (Conf. Rep.).  Nor, on the other hand, is there any apparent indication that Congress intended that the DFC remain covered despite the change to the board's composition.[2]  The Court can infer little from this silence given the clarity of the statutory text. See Encino Motorcars, LLC v. Navarro, 138 S. Ct. 1134, 1143, 200 L. Ed. 2d 433 (2018) ("If the text is clear, it needs no repetition in the legislative history; and if the text is ambiguous, silence in the legislative history cannot lend any clarity.")

At bottom, the plain text of the Sunshine Act provides that the statute applies only if a majority of an agency's board members are "appointed *to such position* by the President with the advice and consent of the Senate."  5 U.S.C. § 552b(a)(1).  OPIC's board had eight such

---

[2] As far as the Court can tell, the only rationale articulated in the legislative history for the reorganization of DFC's board was to ensure representation of the United States' national security and diplomacy interests on the board.  See Hearing before the H. Comm. on Foreign Affairs, 115th Cong. 4–5 (2018) (statement of Ray Washburne, President, CEO, OPIC) ("The [DFC] will have better policy alignment and strong links to State and USAID to ensure its transactions align with U.S. foreign policy."); An Update on American Diplomacy to Advance Our National Security Strategy: Hearing before the S. Comm. on Foreign Relations, 115th Cong. 87–88 (2018) (statement of Mike Pompeo, Secretary of State) ("As board chair, I would commit to make [sic] our foreign policy priorities including national security, commercial and development objectives central to the mission of the [DFC]".).

members out of fifteen, whereas the DFC's board now has only four out of nine.  And Congress gave no indication one way or the other as to how it wished the DFC to be treated for Sunshine Act purposes.  Therefore, the Sunshine Act does not apply to the DFC.

*   *   *

A final thought.  As plaintiffs emphasize, the Sunshine Act is "founded on the proposition that the government should conduct the people's business in public."  Opp. at 3.  This observation echoes Judge Wald's dissent four decades ago in Symons.  Symons, 670 F.2d at 246-48 (Wald, J., dissenting).  Given the Act's foundational purpose, she found the statute's broad definition of "agency" capacious enough to accommodate a reading that would treat ex-officio board members towards a Sunshine Act majority.  Id. at 249.  The panel majority disagreed, and the Court is bound to apply its reasoning here.  Yet today's Circuit might find it appropriate to reexamine Judge Wald's analysis in light of the differences between the DFC CEO's board status and that of the ex-officio directors in Symons.  While those differences have not carried the day in this Court, the Circuit may see more leeway to revisit the application of its precedent in the first instance.

## IV.  Conclusion

For the foregoing reasons, the Court will GRANT Defendant's Motion to Dismiss.  A separate Order shall accompany this memorandum opinion.

_____<br>
CHRISTOPHER R. COOPER<br>
United States District Judge

Date:  February 11, 2022

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY,<br>378 N. Main Avenue<br>Tucson, AZ 85701,<br><br>FRIENDS OF THE EARTH,<br>1101 15th Street, 11th Floor<br>Washington, D.C. 20005,<br><br>     and<br><br>CENTER FOR INTERNATIONAL<br>ENVIRONMENTAL LAW,<br>1101 15th Street, 11th Floor,<br>Washington, D.C. 20005,<br><br>          Plaintiffs,<br><br>     v.<br><br>UNITED STATES INTERNATIONAL<br>DEVELOPMENT FINANCE<br>CORPORATION,<br>1100 New York Avenue, NW<br>Washington, D.C. 20527,<br><br>          Defendant. | Civil Action No. |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

### INTRODUCTION

1.     Plaintiffs bring this lawsuit to challenge a final agency rule that attempts to

exempt the United States International Development Finance Corporation ("DFC"), a federal

agency, from the requirements of the Sunshine Act, 5 U.S.C. § 552b *et seq.*

2.     This action is brought under the Sunshine Act, 5 U.S.C. § 552b, and the

Administrative Procedure Act, 5 U.S.C. § 551 *et seq.* ("APA"), to compel the DFC to provide

public access to its deliberations and meetings and otherwise comply with requirements of these

statutes.

## JURISDICTION AND VENUE

3.     This Court has jurisdiction over this action under 5 U.S.C. § 552b(g) and (h) (the

Sunshine Act), 5 U.S.C. § 702 (the Administrative Procedure Act), and 28 U.S.C. § 1331

(federal question jurisdiction).

4.     Venue is proper in the District of Columbia pursuant to 28 U.S.C. § 1391(e), as

this civil action is brought against an agency of the United States and under the color of legal

authority, a substantial part of the events giving rise to the claim occurred in the District of

Columbia, no real property is involved in this action, and Plaintiffs maintain offices or reside in

this judicial district.  *See also* 5 U.S.C. § 552b(h).

## PARTIES

5.     Plaintiff CENTER FOR BIOLOGICAL DIVERSITY ("Center") is a non-profit

conservation organization with offices throughout the United States and in Mexico.  The Center

has more than 81,000 members.  For the past decade, the Center has carefully monitored both the

Overseas Private Investment Corporation ("OPIC"), which is now DFC, particularly as it relates

to agency actions that may affect federally threatened and endangered species, or otherwise may

have a significant impact upon the environment and biological diversity.  Center staff and

members have attended both OPIC and DFC public meetings and hearings over the past several

years.  Without the transparency requirements of the Sunshine Act, Center staff and members

will not receive timely public information about projects and activities of the agency, nor will

Center staff and members receive transcripts, minutes or other records and documents from agency meetings.  This depravation of a legal right causes injury to the Center, its staff, and its members, which can only be cured if DFC complies with the Sunshine Act as Congress intended.

6.      Plaintiff FRIENDS OF THE EARTH ("FoE") is an international environmental organization with 75 national member groups.  FOE-U.S. is a national non-profit conservation organization with offices in Berkeley, California and Washington, D.C., where it is headquartered, and staff located across the country.  FoE is a membership organization consisting of more than 140,000 members and almost 3 million activists nationwide. FoE is also a member of Friends of the Earth-International, which is a network of grassroots groups in 74 countries worldwide. FoE's mission is to protect our natural environment, including air, water, and land, to create a healthier and more just world. FoE utilizes public education, advocacy, legislative processes, litigation, and most importantly, open access to government processes and records, to achieve its organizational goals.  For years, FOE has advocated for more sustainable funding mechanisms and actions from both OPIC and the DFC.  FOE and its staff and members are regular attendees and participants at DFC public meetings, and are recognized experts in this field.

7.      Plaintiff CENTER FOR INTERNATIONAL ENVIRONMENTAL LAW ("CIEL") is a non-profit legal organization with offices in Washington, D.C., and Geneva Switzerland. On behalf of 50,000 supporters in the United States and worldwide, CIEL uses the power of law to protect the environment, promote human rights and ensure a just and sustainable society.  As a critical element of that mission, CIEL has monitored and engaged with OPIC and now DFC for more than 25 years.  CIEL played an active role in civil society efforts that led to the establishment of OPIC's Accountability Mechanism.  CIEL has prepared guides for civil

3

society participation in OPIC processes.  CIEL has represented communities harmed by OPIC-financed projects. In support of these efforts, CIEL staff have attended both OPIC and DFC public meetings and hearings over more than two decades.  Without the transparency requirements of the Sunshine Act, CIEL will not receive timely information about projects and activities of the agency, nor will CIEL staff receive transcripts or documents from agency meetings.  This deprivation of a legal right causes injury to CIEL, its staff and supporters, and the communities around the world with whom CIEL partners.  This injury can only be cured if the DFC complies with the Sunshine Act as Congress intended.

8.      Defendant United States International Development Finance Corporation (or "DFC") is a federal agency created by the 2018 "BUILD Act."  P.L. 115-254, 132 Stat.3485 (October 5, 2018).  Its predecessor entity was called OPIC ("Overseas Private Investment Corporation"), which was also a federal agency created by Congress.

## LEGAL FRAMEWORK AND BACKGROUND

9.      On April 13, 2020, DFC published a rule exempting itself from the Sunshine Act, alleging that DFC does not meet the definition of "agency" under the Act.  Sunshine Act Exemption Regulation, 85 Fed. Reg. 20,423 (Apr. 13, 2020).

### A.      The DFC's Functions and Powers

10.      Previously, in 2018, Congress passed the Better Utilization of Investments Leading to Development Act, or the BUILD Act, which in turn created the DFC. 22 U.S.C. § 9612(a).

11.      The BUILD Act establishes a Board for the DFC.  The DFC is composed of a Board of Directors made of nine members.  The statute breaks the Board composition into three distinct categories: (i) the Chief Executive Officer of the Corporation; (ii) four officers specified

in subparagraph (B); and (iii) four other individuals who shall be appointed by the President, by and with the advice and consent of the Senate.  22 U.S.C. § 9613(b)(2)(A).

12.    The four officers identified in subparagraph (B) are the Secretary of State (or designee), the Administrator of the U.S. Agency for International Development (or designee), the Secretary of the Treasury (or designee), and the Secretary of Commerce (or designee).  22 U.S.C. § 9613(a)(2)(B).  These are the four *ex officio* members of the new DFC Board.

13.    The Chief Executive Officer of the Corporation is nominated by the President with the advice and consent of the Senate.  22 U.S.C. § 9613(d)(1).  The Chief Executive Officer is the ninth and final member of the Board.  22 U.S.C. § 9613(b)(2)(A)(i).

14.    The Chief Executive Officer is "responsible for the management of the Corporation and shall exercise the powers and discharge the duties of the Corporation subject to the bylaws, rules, regulations, and procedures established by the Board," of which the Chief Executive Officer is a part.  22 U.S.C. § 9613(d)(2).

15.    The DFC combines and modernizes the existing development finance functions of a former federal agency known as OPIC and the U.S. Agency for International Development's ("US AID") Development Credit Authority.  *See, e.g.*, 22 U.S.C. § 9684 (terminating OPIC after creation of the DFC); *see also* DFC Overview, https://www.dfc.gov/who-we-are/overview (last visited May 27, 2021).

16.    The DFC is directed by statute "to mobilize and facilitate the participation of private sector capital and skills in the economic development of less developed counties . . . in order to complement the development assistance objectives, and advance the foreign policy interests, of the United States."  22 U.S.C. § 9612(b).

17.     The BUILD Act possesses two "public hearing" provisions, neither of which are as comprehensive as the Sunshine Act.

18.     The first public hearing provision states that the DFC Board "shall develop, in consultation with stakeholders, other interested parties, and the appropriate congressional committees, a publicly available policy with respect to consultations, hearings, and other forms of engagement in order to provide for meaningful public participation in the Board's activities." 22 U.S.C. § 9613(b)(1)(C).

19.     The second public hearing provision states that the DFC "Board shall hold at least 2 public hearings each year in order to afford an opportunity for any person to present views with respect to whether — (1) the Corporation is carrying out its activities in accordance with this division; and (2) any support provided by the Corporation under title II in any country should be suspended, expanded, or extended."  22 U.S.C. § 9613(c).

20.     OPIC was subject to the Sunshine Act.  OPIC was an "agency" under the Sunshine Act.  *See, e.g.*, 84 Fed. Reg. 6839–40 (Feb. 28, 2019).

21.     Nothing in the legislative history indicates Congress wanted to change course with the DFC and exempt this new agency from the Sunshine Act, as its predecessor agency, OPIC, was subject the Sunshine Act.

**B.     The Sunshine Act**

22.     The Sunshine Act requires that "every portion of every meeting" of a multi-member agency must "be open to public observation," with narrow exceptions, 5 U.S.C. § 552b(b)–(c).  The Sunshine Act also requires agencies to announce publicly the time, place, and subject matter of meetings at least a week before the meeting, 5 U.S.C. § 552b(e)(1), and to

prepare a complete transcript or electronic recording of meetings that are closed for any reason, 5

U.S.C. § 552b(f).

23.     Agencies must also promulgate regulations implementing the requirements of the

Sunshine Act.  5 U.S.C. § 552b(g).

24.     "Congress enacted the Sunshine Act to open the deliberations of multi-member

federal agencies to public view."  *Common Cause v. Nuclear Reg. Comm'n*, 674 F.2d 921, 928

(D.C. Cir. 1982).  The Sunshine Act is "founded on the proposition that the government should

conduct the public's business in public."  S. Rep. No. 354, 94th Cong., 1st Sess. 1; Conf. Re. No.

1178, 94th Cong., 2d Sess. 9 (1976), *reprinted in* 1976 U.S. Code Cong. & Admin. News 2183,

2245.

25.     Under the Sunshine Act, the term "agency" means "any agency . . . headed by a

collegial body composed of two or more individual members, a majority of whom are appointed

to such position by the President with the advice and consent of the Senate."  5 U.S.C.

§ 552b(a)(1).

26.     On at least two occasions, DFC scheduled a Sunshine Act meeting before

deciding in April 2020 that it was no longer subject to the Sunshine Act.  *See, e.g.*, 85 Fed. Reg.

12,777 (Mar. 4, 2020) (DFC announcement of Sunshine Act meeting); 84 Fed. Reg. 66,436

(Dec. 4, 2019) (joint DFC and OPIC announcement of Sunshine Act meeting).

C.     **The Administrative Procedure Act**

27.     The APA governs the public access and transparency of actions of all federal

agencies, including agency final rules.  5 U.S.C. § 552 *et seq*.

28.     Under the APA, a reviewing court "shall" set aside agency actions, findings, or

conclusions when they are arbitrary, capricious, an abuse of discretion, or otherwise not in

accordance with law"; when they are adopted "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right"; or when they are adopted "without observance of procedure required by law."  5 U.S.C. § 706(2)(A), (C), (D).

29.    An agency action is arbitrary and capricious if the agency "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency," or if the agency's decision "is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfr. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

30.    When reviewing agency action under the APA, the court must ensure that the agency reviewed the relevant data and articulated a satisfactory explanation establishing a "rational connection between the facts found and the choice made." *Motor Vehicle Mfr. Ass'n*, 463 U.S. at 43.  The agency's failure to do so renders its decision arbitrary and capricious. *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 378 (1989).

31.    The APA defines a rule as "the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy." 5 U.S.C. § 551(4).

32.    The adoption of legislative rules must comply with the notice-and-comment provisions of the Administrative Procedure Act. 5 U.S.C. § 553.  *See also Nat'l Family Planning & Reprod. Health Ass'n, Inc. v. Sullivan*, 979 F.2d 227, 235 (D.C. Cir. 1992).

### D.    Nonbinding Agency Guidance

33.    Defendants' final rule exempting itself from the Sunshine Act also cited policy guidance from the Department of Justice that never went through public comment and is

nonbinding.  *See Whether the Millennium Challenge Corporation Should Be Considered an ''Agency'' for Purposes of the Open Meeting Requirements of the Sunshine Act*, 37 Op. O.L.C. (May 3,2013) (hereinafter, "MCC Legal Opinion") (believing the *ex officio* definition extends to the CEO of the MCC because it is listed in the same subsection as other traditionally *ex officio* members).

34.      However, the Millennium Challenge Corporation ("MCC") statute is different from the BUILD Act.  *Compare* Millennium Challenge Act Board provisions, 22 U.S.C. § 7703(c), *with* BUILD Act creating DFC Board 22 U.S.C. § 9613(b) (designating the CEO of the board in its own distinct subsection separate from the listing of traditionally *ex officio* members).

35.      The MCC Board also has nine members, but Congress explicitly grouped these members in a very specific and different way.  Specifically, Congress requires the MMC Board include "(A) the Secretary of State, the Secretary of the Treasury, the Administrator of the United States Agency for International Development, the Chief Executive Officer of the Corporation, and the United States Trade Representative; and (B) four other individuals with relevant international experience who shall be appointed by the President, by and with the advice and consent of the Senate." 22 U.S.C. § 7703(c).

36.      The U.S. Department of Justice and Office of Legal Counsel ("OLC") relied on this structural organization of the MCC statute to extend the ex officio definition to the CEO of the MCC.  *See* MCC Legal Opinion, *supra*.

### E.     Previous OPIC Law

37.     DFC's predecessor agency, the Overseas Private Investment Corporation (OPIC), also possessed a Board, which also included the Board President, who served as chief executive officer.  22 U.S.C. § 2193(c) (repealed).

38.     There are many similarities between the OPIC organic statute and the BUILD Act, including the purposes and procedures of the agency corporations created by the two statutes.  For example, the OPIC organic statute did not explicitly mention the Sunshine Act, but explicitly provided for public hearings.  *See* 22 U.S.C. § 2191a(c) (repealed).

39.     DFC's agency predecessor OPIC did comply with the Sunshine Act.  *See, e.g.*, 84 Fed. Reg. 6839–40 (Feb. 28, 2019) (Notice of OPIC Sunshine Act meeting).

40.     In addition, the OPIC chief executive served on the OPIC Board.  *See* 22 U.S.C. § 2193(c) (repealed).

41.     The DFC chief executive also serves on the new DFC Board.

### FACTUAL BACKGROUND

42.     The DFC Sunshine Exemption Regulation issued on April 13, 2020, asserted that Defendant DFC is not "headed by a collegial body composed of two or more individual members, a majority of whom are appointed to such position by the President with the advice and consent of the Senate."  5 U.S.C. § 552b(a)(1).

43.     Defendant agency did not issue a proposed rule for exempting itself from the Sunshine Act, nor did it allow for any public notice and comment on the issue of exempting itself from the Sunshine Act.

44.     The rule addresses that "four of the nine DFC board members are appointed by the President with the advice and consent of the Senate solely for the purpose of serving on

DFC's Board."  DFC classifies the remaining five members, including the Chief Executive

Officer of the DFC, as "hold[ing] their position by virtue of appointment to a different office."

Sunshine Act Regulations, 85 Fed. Reg. 20,243 (Apr. 13, 2020).

45.     The final rule decides the Chief Executive Officer of the DFC, who

simultaneously serves on the Board, was not appointed by the President with the advice and

consent of the Senate for the purpose of serving on the DFC Board.  *Id.*

46.     The DFC has held meetings for the purpose of accomplishing its statutory duties

but has not provided for public access to those meetings nor has it complied with any of the other

requirements of the Sunshine Act.

47.     The DFC will conduct additional meetings in the future but does not intend to

comply with the Sunshine Act.  *See* Sunshine Act Exemption Regulation, 85 Fed. Reg. 20,423

(Apr. 13, 2020).

48.     A rule is substantive or legislative when it has "the force and effect of law." *Kisor*

*v. Wilkie*, __ U.S. __, 139 S. Ct. 2400, 2420 (2019) (citation omitted). Unlike "interpretive rules,

general statements of policy, or rules of agency organization, procedure, or practice," "[t]he APA

mandates that substantive, legislative rules be promulgated only after public notice and

comment.'" *Clarian Health W., LLC v. Hargan*, 878 F.3d 346, 356 (D.C. Cir. 2017) (quoting 5

U.S.C. § 553(b)(3)(A)).

49.     An agency decision to exempt itself from the Sunshine Act, particularly under the

facts of this case where the DFC is breaking from both precedent and tradition, is a substantive

and legislative rule.

50.     Defendant DFC appears to take the position that the chief executive of the DFC is somehow *ex officio* to his own agency.  This legal and factual position was not subjected to public notice and comment.

51.     DFC's theory is illogical and belied by the plain language of the statute.  The President nominates the DFC chief executive "for such position" and that position explicitly includes a spot on the Board by statute.  22 U.S.C. § 9613.  *But see* Letter from Liam P. Hardy, Deputy Assistant Att'y Gen., to Kevin L. Turner, Vice President and Gen. Counsel, U.S. Int'l Dev. Fin. Corp., (Feb. 25, 2020) (hereinafter "DFC Legal Memo") ("The fifth director, DFC's Chief Executive Officer, is also 'properly regarded as one of these ex officio members, because by statute the CEO is appointed to a separate office and serves on the Board by virtue of that separate office'" (citing 22 U.S.C. § 9613(d)(1) and the MCC Legal Opinion).

52.     This DFC Legal Memo, which also did not go through notice and comment under the APA, blindly follows the conclusion of the MCC Legal Memo but does not take into account the specific differences in the DFC's organic statute, nor the unique history and operations of the DFC's predecessor agency.

53.     As Defendants noted in the final rule exempting itself from the Sunshine Act, as well as the DFC Legal Memo, *supra*, the leading case in this Circuit on this issue is *Symons v. Chrysler Corp. Loan Guarantee Bd.*, 670 F.2d 238 (D.C. Cir. 1981).  As *Symons* states, the definition of agency in the Sunshine Act "is quite specific."  *Id.* at 239–40, *citing* 5 U.S.C. § 552b(a)(1).

54.     The issue in *Symons* was the phrase "a majority of who are appointed to *such position*."  *Id.* at 240. The court explained that "although all Board members have been appointed to some position by the President with the advice and consent of the Senate, they were not so

appointed to their *Board* positions.  Rather, they serve, according to statutory mandate, by virtue of the other offices they hold."  *Id.*

55.     Thus, in *Symons*, the President had already appointed, and the Senate had already confirmed, *all* board members for other, unrelated, positions (for example, the Secretary of the Treasury).  These board members are called "ex officio" board members.  *Id.* at 242 (citing *Government in Sunshine Act: Hearings on H.R. 11656 Before the Subcomm. on Administrative Law and Gov't Relations of the House Committee on the Judiciary*, 94th Cong, 2d sess. 16 (1976)).

56.     Further, "[a]lthough the idea of listing covered agencies was ultimately rejected by Congress for the reasons just stated, both the Senate Report and the House Judiciary Report set forth what Congress believed was a complete list of entities that would be covered by the Sunshine Act's definition of "agency." It should be noted that not one of the forty-seven agencies listed had a majority of ex officio members. Each one had a majority of persons who were appointed by the President *to the agency itself*." *Symons*, 670 F.2d at 244 (emphasis added).

57.     The DFC has conducted meetings over the last year but has not followed the requirements of the Sunshine Act.  *See, e.g.,* DFC Meeting Notices without Sunshine Act compliance on December 10, 2020,

https://www.dfc.gov/sites/default/files/media/documents/Website%20Notice%20-%20Meeting%20Agenda%20-%2003-09-2021.pdf, and March 9, 2021,

https://www.dfc.gov/sites/default/files/media/documents/Website%20Notice%20-%20Meeting%20Agenda%20-%2003-09-2021.pdf.

## CLAIMS FOR RELIEF

<u>First Claim – Failure to Issue a Proposed Rule and Provide for Public Comment
Under the Administrative Procedure Act</u>

58.     Plaintiffs re-allege and incorporate by reference all the allegations set forth in this

Complaint, as though fully set forth below.

59.     The APA requires that legislative rules be adopted through notice and comment

rulemaking. 5 U.S.C. § 553.

60.     The DFC rule exempting itself from the Sunshine Act was not subject to public

notice and comment.  5 U.S.C. § 553.

61.     The DFC's failure to provide adequate notice to the public and failure to provide

an opportunity for public comment on a proposed rule harms Plaintiffs and is not in accordance

with the Administrative Procedure Act. 5 U.S.C. §§ 553, 706(2)(A).

<u>Second Claim – Violation of the Sunshine Act and the APA</u>

62.     Plaintiffs re-allege and incorporate by reference all the allegations set forth in this

Complaint, as though fully set forth below.

63.     The Sunshine Act requires "each agency subject to the requirements" of the

Sunshine Act to comply with its open meeting, public notice, and agency business requirements

of the Sunshine Act. 5 U.S.C. § 552b(a), (b), (e).

64.     DFC is a federal agency under the Sunshine Act and subject to the Sunshine Act.

65.     The DFC's final rule exempting itself from the Sunshine Act is contrary to the

Sunshine Act and is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance

with law" under the APA. 5 U.S.C. §§ 552b(a), (b); 706(2).

66.     DFC's failure to comply with the Sunshine Act and APA is injuring and will continue to injure Plaintiffs by preventing them from learning about and attending the DFC's meetings, deliberations, and operations.

<u>Third Claim – Violation of the Sunshine Act and APA, Failure to Act</u>

67.     Plaintiffs re-allege and incorporate by reference all the allegations set forth in this Complaint, as though fully set forth below.

68.     The Sunshine Act requires each "agency" that is subject to the Act to promulgate regulations implementing the Sunshine Act's requirements.  5 U.S.C. § 552b(g).

69.     DFC is an "agency" subject to the Sunshine Act yet has failed to promulgate agency Sunshine Act regulations.

70.     In failing to promulgate regulations and take other steps necessary to implement the Sunshine Act—including open meeting, transcript, minutes, and record keeping requirements—DFC has unlawfully withheld and unreasonably delayed required agency action. 5 U.S.C. §§ 552b(b), (j), (k); 706(1).

71.     DFC's failure to comply with the Sunshine Act is injuring and will continue to injure Plaintiffs by preventing them from learning about and attending all of the DFC's meetings, deliberations, and operations.

**PRAYER FOR RELIEF**

For these reasons, Plaintiffs requests that the Court:

(1)     Enter an order declaring that the DFC:

(a)     is subject to the Sunshine Act, and is currently violating the Sunshine Act's requirements;

(b)      is unlawfully withholding and unreasonably delaying agency action, and is

acting arbitrarily, capriciously, and contrary to law, in violation of the

APA.

(2)      Enter an order permanently enjoining the DFC from conducting any further

meetings unless and until it undertakes to comply with the requirements of the

Sunshine Act, 5 U.S.C. §§ 552b(a)–(m).

(3)      Enter an order directing the DFC to comply promptly with the requirements of the

Administrative Procedure Act and the Sunshine Act, and to issue a proposed rule,

open to public comment, on how the agency will comply with the Sunshine Act

within 90 days of the order, with a final rule promulgated appropriately thereafter.

(4)      Award plaintiff(s) their costs, reasonable attorneys' fees, and other disbursements

in this action; and

(5)      Grant such other and further relief as the Court may deem just and proper.


Dated:  June 2, 2021                              Respectfully submitted,


                                                  /s/  William J. Snape, III
                                                  William J. Snape, III (DC Bar No. 455266)
                                                  Center for Biological Diversity
                                                  American University Law School
                                                  4300 Nebraska Ave, NW
                                                  Washington, D.C. 20016
                                                  wsnape@wcl.american.edu
                                                  bsnape@biologicaldiversity.org
                                                  (202) 536-9351

                                                  *Counsel for Plaintiffs*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, et al., | |
| Plaintiffs, | Civil Action No. 1:21-cv-1491-CRC |
| v. | |
| UNITED STATES INTERNATIONAL DEVELOPMENT FINANCE CORPORATION, | |
| Defendant. | |

**DECLARATION OF SARAH UHLEMANN**

I, Sarah Uhlemann, declare as follows:

1.      The facts set forth in this declaration are based upon my personal knowledge.  If called as a witness, I could and would testify to these facts.  As to those matters that reflect an opinion, they reflect my personal opinion and judgment on the matter.

2.      I am a senior attorney and international program director for the Center for Biological Diversity (Center), where I have worked since 2010.  I am also a member of the Center for Biological Diversity, a Section 501(c)(3) organization under the U.S. tax code.  The Center has more than 84,000 members and around 1.7 million activists.

3.      In my role as international program for the Center, I oversee the Center's legal advocacy and international diplomacy to protect imperiled wildlife species outside U.S. borders. In this role, I am very familiar with the Center organizationally and its operations, as well as the Center's work on international issues, including our work to reform U.S. finance agencies.

1

4.      As part of our international work at the Center, we regularly monitor, track, and comment on both the projects proposed by U.S. federal development and funding agencies such as the former Overseas Private Investment Corporation (OPIC) (the Development Finance Corporation's (DFC) predecessor agency) and the U.S. Export-Import Bank.  The Center has been active in monitoring the financing decisions of these agencies over the last decade.  Many of the projects financed by these agencies have a significant impact on both the environment and wildlife species.

5.      In 2017 and 2018, the Center was involved in the legislative creation of the U.S. Development Finance Corporation (DFC) through the Better Utilization of Investment Leading to Development (BUILD) Act, P.L. 115-254 (2018), including the efforts of five Center staff people.  This included meeting with Rep. Maxine Waters (D-CA), Chair of the House of Representatives Financial Services Committee, who was instrumental in the agency's creation.

6.      Throughout our participation in the BUILD Act legislative process, there was no discussion of a desire or intention to exempt the new DFC from the Sunshine Act.  Had here been such an exemption, we would have strongly opposed.

7.      When OPIC was an agency, the Center and its staff relied on Federal Register notices of meetings, minutes of meetings, transcripts of meetings, and records of meetings.  This information was vital for our staff to understand what the agency was considering and proposing and our efforts to ensure the agency considered and mitigated biodiversity and wildlife impacts of their decisions.  Overall, this information allowed Center staff to monitor the workings of OPIC and participate more effectively in the agency's decision-making process.

8.      The Center has submitted comments on several OPIC projects.  For example, in 2017 and 2018, the Center and our colleagues submitted detailed comments regarding OPIC's

2

consideration of financing for the PT. Domas Agrointi Prima (DAP) Oleochemical Project in

Medan, Indonesia.  Those comments detailed OPIC's failure to address impacts on critical

forests and natural habitat, as well as impacts to endangered species.  In 2019, the Center and our

colleagues submitted detailed comments opposing OPIC's support for the Rovuma Liquefied

Natural Gas (LNG) project in Cabo Delgado, Mozambique.  The comments detailed the project's

impacts to climate change and the sensitive marine habitats in the area, inhabited by several

imperiled species of sea turtles and whales.  We also met with OPIC staff to discuss the project,

along with our coalition partners.

     9.     The Center has also commented on projects the U.S. Export-Import Bank has

funded, including two LNG projects in Australia's Great Barrier Reef, and reviewed minutes of

meetings that agency provided.

     10.     The Center and its staff have participated in the several "public" meetings offered

by DFC since its creation, but many meetings have been private, falling far short of what would

be required under the Sunshine Act.  *See* Attachments A and B (notices of closed DFC

meetings).

     11.     The Center will not be able to effectively monitor and learn about what the new

DFC agency is doing without the Sunshine Act's requirements, which limits our ability to submit

information and advocate regarding our and our members' interests in wildlife and biodiversity

affected by DFC-funded projects.

     12.     For all the reasons so stated, the Center for Biological Diversity, our staff, and our

ability to advocate are harmed by the DFC's failure to follow the Sunshine Act and the

deprivation of information on DFC's activities and decision-making.  If DFC were ordered to

3

comply with the Sunshine Act, we would have greater access to and more detailed information about the agency's actions and decisions.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Dated: July 8th, 2021.

Sarah Uhlemann

4

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, et al., | |
| Plaintiffs, | Civil Action No. 1:21-cv-1491-CRC |
| v. | |
| UNITED STATES INTERNATIONAL DEVELOPMENT FINANCE CORPORATION, | |
| Defendant. | |

**DECLARATION OF KATE DEANGELIS**

I, KATE DEANGELIS, declare as follows:

1.      The facts set forth in this declaration are based upon my personal knowledge. If called as a witness, I could and would testify to these facts. As to those matters that reflect an opinion, they reflect my personal opinion and judgment on the matter.

2.      I am submitting this declaration on behalf of myself and Friends of the Earth United States (FOE). I am currently a member of FOE. I have also been a staff member of FOE since 2014 and am the organization's International Finance Program Manager. In this role, I specifically work on issues under the jurisdiction of the U.S. International Development Finance Corporation (DFC) and its predecessor, the Overseas Private Investment Corporation (OPIC). I have focused on these issues since 2015.

3.     FOE is a 501(c)(3) non-profit, membership-based organization with offices located in California and Washington, DC.  FOE currently has over 2.9 million activists and over 138,000 members, located across all 50 states and the District of Columbia.  FOE is also a member of Friends of the Earth-International, which is a network of grassroots groups in 74 countries worldwide. FOE's primary mission is to defend the environment and champion a healthier and more just world by collectively ensuring environmental and social justice, human dignity, and respect for human rights and peoples' rights.

4.     FOE began its Overseas Private Investment Corporation (OPIC) work in the mid-1990s when FOE successfully expanded the environmental and social policy frameworks for the OPIC, the U.S. development finance agency. In 2002, we filed a precedent-setting climate lawsuit against OPIC and the U.S. Export-Import Bank (EXIM) that resulted in the first-ever climate policies at these institutions. We have played a key influential role in progressive improvement in these policies ever since. More recently, we played a pivotal role in ensuring that the climate, environmental, and social protections and transparency and accountability policies that we fought for decades to attain at OPIC were carried over to the newly established U.S. International Development Finance Corporation (DFC), which absorbed OPIC and more than doubled the financing capacity. For example, we successfully pushed for OPIC's cap and reduction schedule for its portfolio of greenhouse gas emissions transferred over to DFC. As part of this process, we locked in and locked in commitments to the policy's enforcement by the agency's most senior officials. In addition, we successfully advocated for the maintenance and improvement of OPIC's Office of Accountability where project impacted communities can file complaints that can go through mediation or problem solving.

5.      Prior to the creation of DFC, I and other FOE colleagues have for many years taken part in public hearings and provided comments and engaged around board decisions on projects and policies at OPIC. We were heavily reliant on notification in the Federal Register to learn about upcoming public hearings as well as the proposed projects and policies that the OPIC board would be voting on. These notifications allowed us to properly prepare our comments, weigh in on the relevant topics, inform the public about pending decisions and upcoming opportunities to engage, and place op-eds and blogs on pending projects in a timely fashion. Open access to these meetings and deliberations is in the public interest as evidenced by recent findings from FOE, showing that EXIM ignored risks when approving support for the Mozambique LNG project in northern Mozambique.[1] In addition, thanks to the Sunshine Act, we were able to receive notes from the board meeting that approved support for the Vaca Muerta fracking projects in Argentina. These notes revealed the concerned that were raised and dismissed one by one on the project. We also drove calls on the Vaca Muerta project to encourage Senators to voice opposition to OPIC; submitted comments with almost 4,500 signatures of our members; published an opinion piece in DevEx with Maria Marta Di Paolo; and helped members of Congress submit letters in opposition to Vaca Muerta. We submitted comments with 28,000 signatures of our members and activists opposing OPIC support for a coal plant in Kosovo. FOE participated in the following OPIC hearings recently:

(a)      On June 15, 2017, I presented on an upcoming report analyzing Power Africa transactions. I recommended that OPIC continue its practice of not financing coal

---

[1] Paul Burkhardt & Matthew Hill, *U.S. Export-Import Bank Warned on Mozambique Risks Before $4.7 Billion Loan*, Bloomberg (Apr. 6, 2021), https://www.bloomberg.com/news/articles/2021-04-06/u-s-ex-im-warned-on-mozambique-risks-before-4-7-billion-loan.

projects; discontinue, over time, the financing oil and gas projects; and continue

financing clean energy projects. This presentation allowed for a continued

discussion on the climate impacts of gas and the benefits of distributed

renewables.

(b)     On September 14, 2017, I presented on a review of projects financed under the

Power Africa initiative, which aimed to provide visibility into the types of energy

projects being financed by the U.S. Government and recommended an increase in

support for distributed renewables.

(c)     On December 14, 2017, I presented at OPIC's hearing on OPIC's potential

support for a liquefied natural gas (LNG) project in Vietnam. At the hearing I

requested the letter of interest, expressed concern for such support, and explained

the negative impacts of LNG. I later received the letter of interest on the project.

(d)     On December 6, 2018, I presented on why OPIC should not support the Kosovo

coal plant and recommendations for OPIC's transition to DFC, including the need

to be a leader in environmental and social policies. This presentation allowed for

continued engagement with OPIC on the Kosovo coal plant, which resulted in

OPIC not supporting the project.

(e)     On June 5, 2019, while I was a maternity leave, my colleague Karen Orenstein

presented to OPIC on fossil fuel financing and support for renewable energy,

opposition to the Kosovo coal plant, and the need for transparent processes and

meaningful engagement with civil society.

JA-47

(f)    On September 4, 2019, Karen Orenstein presented to the OPIC board on the negative impacts of the Vaca Muerta fracking projects in Argentina and urged OPIC to not support the projects.

6.    At the end of 2019, DFC succeeded OPIC. Following this change, I continued to take part in DFC public hearings when they were announced in the Federal Register and participated in the following:

(a)    On June 3, 2020, I presented on the findings of our recent reports with regards to OPIC's support for energy projects from 2005 to 2019. From this analysis, FOE recommended that OPIC increase its support for renewables, end its support for fossil fuels, and improve its accounting of its greenhouse gas emissions.

(b)    On December 10, 2020, I presented on the flaws in DFC's accounting of its greenhouse gas emissions, DFC's underestimation of the climate impact of methane, and discouraged DFC from support the Pearl Petroleum project in Iraq.

7.    On April 13, 2020, without any prior public notice or comment opportunity, which is itself very problematic for me and FOE, and harms us, the DFC announced in the federal register the final decision to exempt itself from the open meeting requirements of the Sunshine Act.[2] In this announcement, DFC claimed that the Sunshine Act no longer applied to DFC because DFC was substantially different from OPIC and was not considered an agency.

8.    On September 9, 2020, DFC had a board meeting that was closed to the public and was not noticed in the Federal Register because they had since claimed that the Sunshine Act did not apply to them. It was only listed on their website ten days or less before the board

---

[2] *See* 85 Fed. Reg. 20423, DFC Regulations, 22 CFR Part 708 (Apr. 13, 2020), https://www.govinfo.gov/content/pkg/FR-2020-04-13/pdf/2020-07684.pdf

meeting. Since it was not in the Federal Register and not listed for a sufficient period on DFC's website, I did not find out about the board meeting until the day of. At this board meeting, the board voted on the Rovuma LNG project – a liquefied natural gas development and export project in northern Mozambique. I have been working closely with Friends of the Earth Mozambique/Justica Ambiental on this project since 2015, visiting impacted communities, and writing comments and reports analyzing the environmental and social impact assessment and other findings. Without this notification and ability to comment, DFC approved up to $1.5 billion in political risk insurance for the project despite the increasing violence, negative impacts on local communities, and massive greenhouse gas emissions.

9.      In order to effectively do my job, I need public notice of upcoming DFC meetings and open access to those meetings and deliberations. The Sunshine Act mandates proper notice and access to DFC board meetings as I experienced – and greatly relied on – at OPIC. As exemplified by the Rovuma LNG vote, without the Sunshine Act requirements, DFC will provide very little notice, which has the effect of minimizing public knowledge and engagement. This allows DFC to approve highly controversial projects with far less public attention.

10.      DFC is currently considering supporting projects, including the Son My LNG project in Vietnam and the Malicounda heavy fuel oil power plant in Senegal. These projects and others could have potentially devastating impacts on local communities and the local environmental while providing little improvements to energy access. Instead, alternative distributed renewable projects, such a wind microgrid project, are available and would provide access to electricity much faster and more affordably, without the devastating social costs associated with fossil fuel development like the Rovuma LNG project. Being able to advocate against these dirty, harmful projects and for these more sustainable projects at these public

hearings is key to FOE's mission of fighting for a healthier and more just world. If I do not know that these meetings are happening because they are not sufficiently and publicly noticed in the Federal Register, then I cannot participate and provide relevant comments to the board. Without this participation, my comments will not be in the board notes to help influence future project decision and development of policies. Failure to receive appropriate public notice about these meetings and deliberations also prevents FOE from being able to disseminate the information to the public.

11.     For all the reasons so stated, I am personally harmed and Friends of the Earth is harmed by the lack and deprivation of information created by the DFC's decision to exempt itself from the Sunshine Act and by the DFC's failure to follow the Sunshine Act.

I declare under penalty of perjury that the foregoing is true and correct.

Dated this _27_ day of May, 2021.

_Kate DeAngelis_

_____

Kate DeAngelis

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

CENTER FOR BIOLOGICAL DIVERSITY,
et al.,

Plaintiffs,

v.

UNITED STATES INTERNATIONAL
DEVELOPMENT FINANCE
CORPORATION,

Defendant.

Civil Action No. 1:21-cv-1491-CRC

## DECLARATION OF DOUG NORLEN

I, Doug Norlen, declare as follows:

1.      The facts set forth in this declaration are based upon my personal knowledge. If called as

a witness, I could and would testify to these facts. As to those matters that reflect an opinion,

they reflect my personal opinion and judgment on the matter.

2.      I am submitting this declaration on behalf of myself and Friends of the Earth United

States (FOE). I am currently a member of FOE. I have also been a staff member of FOE since

2014 and am Director of FoE's Economic Policy Program. In this role, I specifically oversee

work on issues under the jurisdiction of the U.S. International Development Finance Corporation

(DFC) and its predecessor, the Overseas Private Investment Corporation (OPIC).  I also worked

on issues under the jurisdiction of OPIC at my previous employer, Pacific Environment, between

1996 and 2014.  Pacific Environment is a 501(c)(3) non-profit, membership-based organization with an office located in San Francisco, California.

3.      FOE is a 501(c)(3) non-profit, membership-based organization with offices located in California and Washington, DC.  FOE currently has over 2.8 million members and activists, located across all 50 states and the District of Columbia.  FOE is also a member of Friends of the Earth-International, which is a network of grassroots groups in 74 countries worldwide. FOE's primary mission is to defend the environment and champion a more healthy and just world by collectively ensuring environmental and social justice, human dignity, and respect for human rights and peoples' rights.

4.      FOE began its Overseas Private Investment Corporation (OPIC) work in the mid-1990s when FOE successfully expanded the environmental and social policy frameworks for the U.S. development finance agency. In 2002, we filed a precedent-setting climate lawsuit against OPIC and the U.S. Export-Import Bank (EXIM) that resulted in the first-ever climate policies at these agencies. We have played a key influential role in progressive improvement in these policies ever since. More recently, we played a pivotal role in ensuring that the climate, environmental, and social protections and transparency and accountability policies that we fought for decades to attain at OPIC were carried over to the newly established U.S. International Development Finance Corporation (DFC), which absorbed OPIC and more than doubled the financing capacity. For example, we successfully pushed for OPIC's cap and reduction schedule for its portfolio of greenhouse gas emissions transferred over to DFC.

5.      During the eighteen years I worked at Pacific Environment and seven years at FoE on issues under the jurisdiction of OPIC and DFC, I have researched, monitored, assembled public input, generated media coverage, mobilized members and supporters, and conducted advocacy

on these agencies' environmentally and socially harmful financed projects in the oil and gas, coal, mining, and forestry projects in Asia, Eurasia, Central Asia, Eastern Europe, South America and Africa.  In doing so, I have relied on Sunshine Act required public notification of the agency's board meetings and votes in order to submit timely public comments and to provide other input to the board before the board makes decisions.  As a federal agency, the applicability of the Sunshine Act to DFC ensures that FoE and other public interest organizations can contribute our expertise and the views of our members to inform the board of directors in a timely manner about the potential harm of their pending decisions to the environment and communities and financial, political and reputational risk these decisions pose to the U.S. Government.  The absence of Sunshine Act application to DFC means agency board decisions that potentially cause these harms and risks occurs in the dark, without this beneficial public input.  As a result, FoE and other public interest organizations, and the public at large are harmed when the Sunshine Act is violated by DFC because it prevents us from providing the agency's board of directors with input that can help prevent or mitigate the harms and risks posed by their actions.

6.      On April 13, 2020, without any prior public notice or comment opportunity, DFC announced in the federal register the final decision to exempt itself from the open meeting requirements of the Sunshine Act.  In this announcement, DFC claimed that the Sunshine Act no longer applied to DFC because DFC was substantially different from OPIC and was not considered an agency.

7.      On September 9, 2020, DFC had a board meeting that was closed to the public and was not noticed in the Federal Register because they had since claimed that the Sunshine Act did not apply to them. It was only listed on their website ten days or less before the board meeting. Since

it was not in the Federal Register and not listed for a sufficient period on DFC's website, I did not find out about the board meeting until the day of. At this board meeting, the board voted on the Rovuma LNG project – a liquefied natural gas development and export project in northern Mozambique. FoE has worked closely with Friends of the Earth Mozambique/Justica Ambiental on this project since 2015 and a staff member of my program has visited impacted communities, and written comments and reports analyzing the environmental and social impact assessment and other findings. Without this notification and ability to comment, DFC approved up to $1.5 billion in political risk insurance for the project despite the increasing violence, negative impacts on local communities, and massive greenhouse gas emissions.

8.      For all the reasons so stated, I am personally harmed and Friends of the Earth is harmed by the lack and deprivation of information created by the DFC's decision to exempt itself from the Sunshine Act and by the DFC's failure to follow the Sunshine Act.


I declare under penalty of perjury that the foregoing is true and correct.



_____

Doug Norlen

Friends of the Earth

Dated:  May 26, 2021

DOUG NORLEN DFC SUNSHINE ACT DECLARATION

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, et al., | |
| Plaintiffs, | Civil Action No. 1:21-cv-1491-CRC |
| v. | |
| UNITED STATES INTERNATIONAL DEVELOPMENT FINANCE CORPORATION, | |
| Defendant. | |

## DECLARATION OF CARLA GARCIA ZENDEJAS

I, Carla García Zendejas, declare as follows:

1.      The facts set forth in this declaration are based upon my personal knowledge. If called as a witness, I could and would testify to these facts. As to those matters that reflect an opinion, they reflect my personal opinion and judgment on the matter.

2.      I am submitting this declaration on behalf of myself and the Center for International Environmental Law (CIEL). I am currently a staff member of CIEL and have been since April of 2014. In my role as the Director of the People, Land, and Resources Program, I focus on promoting transparency; access to information; meaningful participation and robust stakeholder engagement; respect for environmental, social, labor, and human rights standards; and public accountability concerning the activities and policies of the U.S. International Development Finance Corporation (DFC) and its predecessor, the Overseas Private Investment Corporation (OPIC). I have focused on these issues since 2015.

3.      CIEL is a 501(c)(3) non-profit, organization with offices in Washington, DC and Geneva, Switzerland. CIEL was established in 1989. Its primary mission is to use the power of law to protect the environment, promote human rights, and ensure a just and sustainable society. CIEL seeks a world where the law reflects the interconnection between humans and the environment, respects the limits of the planet, protects the dignity and equality of each person, and encourages all of earth's inhabitants to live in balance with each other.

4.      CIEL began its work with respect to OPIC in the 1990s, as an early active partner in civil society efforts to monitor U.S. bilateral investment programs and enforce environmental and social standards at OPIC.

5.      In 2001, following work by CIEL to restrict public financing for persistent organic pollutants (POPs)-promoting projects, CIEL, in cooperation with other NGOs, persuaded OPIC to stop all financing of projects producing or using POPs.

6.      CIEL also played a critical role in securing the establishment of OPIC's Accountability Mechanism in 2004, as part of a broader Accountability and Advisory Mechanism (AAM). Since then, CIEL has worked to hold OPIC (and now DFC) accountable to its own policies and procedures and to progressively strengthen those policies and procedures.

7.      In 2007, to increase public accountability and participation in OPIC-related decisions, CIEL published a *Citizen's Guide to the Accountability Mechanism of the Overseas Private Investment Corporation (OPIC)*. The toolkit, available at https://www.ciel.org/wp-content/uploads/2015/03/OPIC_Oct2007.pdf, was designed to help give local communities affected by OPIC-supported projects a voice in the development process.

8.      In 2010, CIEL engaged actively in the public review process for OPIC's Draft Environmental and Social Policy Statement (ESPS). In extensive comments submitted as part of

Garcia Zendejas Decl.
Page 2

that process, CIEL emphasized the critical importance of transparency, public consultation, and disclosure in OPIC's operations.

9.       CIEL engaged in stakeholder meetings during OPIC's 2015 review and update of the 2010 ESPS. In 2016 CIEL and partners submitted detailed comments on the revision of OPIC's ESPS listing specific actions and measures that could improve transparency and accountability.

10.       Also in 2016, CIEL and co-author organizations published the report *Glass Half Full? The State of Accountability in Development Finance*, which assessed the policies, operations, and impact of accountability mechanisms at development finance institutions worldwide. In Annex 14 to that report, CIEL and partners provided a detailed comparative analysis of OPIC's Office of Accountability, along with key findings and recommendations regarding the need for further improvements in transparency in OPIC's decision-making processes. The report is available at https://www.ciel.org/wp-content/uploads/2016/01/IAM_DEF_WEB.pdf.

11.       For many years, CIEL has also supported communities affected by activities financed by OPIC (now DFC) to secure access to information regarding the institution's decision-making processes and to obtain information about OPIC projects and policies, and has attended OPIC Sunshine Act meetings with and on behalf of such partners. For example, in 2008, CIEL supported the Bolivian Indigenous community of Ayllu Jesus de Machaca to file a complaint with OPIC's Office of Accountability concerning displacement and other social and environmental impacts of a silver mine supported by OPIC. This complaint led OPIC to acknowledge in 2009 that it had not applied Involuntary Resettlement and Indigenous Peoples

Policy properly. *See* https://www.ciel.org/news/investigation-finds-that-opic-denied-that-project-affected-community-is-indigenous-did-not-comply-with-its-policies/.

12.     Since 2015, CIEL has supported the Coordinadora Ciudadana No Alto Maipo and Chilean organization Ecosistemas representing communities impacted by the construction of the OPIC-financed Alto Maipo Hydroelectric Project.

13.     Since 2017, CIEL has supported Argentinian communities concerned about the OPIC-backed Vista Oil & Gas project to develop shale oil in the Bajada del Palo block in Argentina's Vaca Muerta region.

14.     Prior to the creation of DFC, I and other CIEL colleagues have for many years taken part in OPIC public hearings, submitted written and oral comments to the institution, and engaged in public discussion regarding projects and policies at OPIC. To do this work, we relied heavily on regular public notice in the Federal Register of upcoming public hearings and information regarding proposed projects and policies to be considered by the OPIC Board at such meetings. With this information, CIEL was able to alert colleagues in countries concerned by current and proposed OPIC activities of potential projects and impacts. In turn, we were able to relay the questions, concerns, and comments of those partners, or of CIEL itself, to the OPIC Board. CIEL was also able to facilitate partners' direct participation in public meetings, so that they could speak on their own behalf, when advance notice of the timing and agenda of such meetings was provided. Such informed participation is in the public interest and contributes to stronger decision-making and avoidance of harm.

15.     Below are several examples of OPIC hearings at which CIEL participated:

(a)     On June 7, 2017, my CIEL colleague Kelsey Alford Jones presented on OPIC's
        Alto Maipo Hydroelectric project on behalf of Chilean partners at an OPIC public

hearing. At this hearing, CIEL raised concerns about inadequate due diligence procedures, pending environmental and technical assessments and ensuing environmental and social impacts. CIEL used the opportunity afforded by the hearing to recommend that OPIC avoid refinancing the Chilean project due to community concerns and major opposition to project impacts and potential harm in the region.

(b)   At an OPIC public hearing held on September 6, 2017, my CIEL colleague Kelsey Alford Jones again presented on the Alto Maipo Hydroelectric Project on behalf of Chilean partners, to address the critical nature of construction impacts on worker safety and on the surrounding community as the result of deficient due diligence. CIEL provided information about construction problems and the death of a worker that led to a series strikes and cost overruns. CIEL conveyed a direct message from Chilean partners calling for OPIC to reconsider its involvement in the project. OPIC reported on its additional financial support for the Alto Maipo Hydroelectric project in its Annual Report for 2017.

(c)   I personally made an intervention at OPIC's quarterly public hearing on June 5, 2019. During the hearing, I conveyed how the construction of the Alto Maipo Hydroelectric Project had impacted the Maipo watershed with damages to farming, tourism, and drinking water supply. I presented information about ongoing worker safety concerns, worker injuries due to landslides and overall concern during project construction. I also communicated the distress of Chilean partners regarding water access and safety in the region. Finally, I requested a timeline for actions in response to OIG USAID's Audit Report *OPIC Investments*

Garcia Zendejas Decl.
Page 5

*Increased Chile's Energy Capacity, but Weak Processes and Internal Controls Diminish OPIC's Ability to Gauge Project Effects and Risks* from February of 2019, which reviewed the Alto Maipo project as part of OPIC's portfolio. CIEL was informed that no action would be taken until the transition to DFC occurred; we relayed this to Chilean partners.

(d)     In 2019, my CIEL colleague Steven Feit attended several meetings at OPIC:

    (1)     On June 14, 2019, Steven Feit attended a meeting with senior OPIC staff to inquire about their funding priorities and to share our concerns about the impacts of specific OPIC projects and OPIC policies related to fossil fuels and climate. This enabled CIEL to communicate OPIC's intentions to our partners within and without the United States and helped CIEL to build a working relationship with OPIC senior staff.

    (2)     On August 26, 2019, Steven Feit, along with Karen Orenstein, representing Friends of the Earth-US (FOE-US), and Maria Marta di Paola representing Argentinean organization Fundación Ambiente y Recursos Naturales (FARN), submitted comments on an environmental and social impact assessment (ESIA) for two proposed hydraulic fracturing ("fracking") projects in Argentina. This resulted in OPIC staff responding to our comments and addressing objections CIEL raised to elements of the ESIA.

    (3)     On September 4, 2019, Steven Feit attended OPIC's Quarterly Public Hearing on behalf of CIEL. Karen Orenstein of FOE-US presented a list of concerns with the proposed fracking project in Argentina on behalf of

Garcia Zendejas Decl.
Page 6

FOE-US and CIEL. This had the effect of putting the OPIC board and

staff on continued notice of CIEL's ongoing concerns regarding approval

of the Vista and Aleph fracking projects in Argentina.

(4)     On September 9, 2019, Karen Orenstein and Steven Feit attended a

meeting with David Bohigian, then CEO of OPIC, and other senior OPIC

staff, on behalf of the group of organizations (CIEL, FOE-US and FARN)

that had submitted comments in opposition to a project to fund fracking in

Argentina. CIEL addressed our numerous concerns with the project, its

impact on climate change, the environment, and the rights of Indigenous

Peoples, and highlighted potential conflicts of interest, with the

recommendation that OPIC not fund the project.

(5)     On September 11, 2019, Steven Feit attended the final OPIC board

meeting to raise a final objection to the approval of OPIC financing for

fracking projects in Argentina.

16.     At the end of 2019, DFC succeeded OPIC. Following this change, my colleagues

at CIEL and I continued to engage during the OPIC–DFC transition. In early 2020, CIEL and

partners expressed concern over the process and contents of the draft Transparency Policy and

Board of Directors Public Engagement Policy opened for comment by the DFC. At this time,

CIEL reminded DFC of the stipulations of the BUILD Act which required the use of best

practices with respect to transparency and environmental and social safeguards while providing

extensive comments to the draft transparency policy.

17.     On April 13, 2020, without any prior public notice or comment opportunity, DFC

announced in the Federal Register the final decision to exempt itself from the open meeting

Garcia Zendejas Decl.
Page 7

requirements of the Sunshine Act. Since then, DFC has not held any public meetings of which my CIEL colleagues or I have had notice or in which CIEL representatives have had an opportunity to participate.

18.    In the ensuing months, this lack of transparency or opportunity for public engagement with the institution has impaired CIEL's ability to track DFC's monitoring of the Alto Maipo Project in Chile and fracking projects in Argentina, as well as to identify and track decision-making regarding projects under consideration that have significant social, environmental, and human rights impacts. For example, without prior public notice and ability to comment, in September 2020, the DFC Board approved political risk insurance for the Rovuma LNG project in Mozambique—an offshore gas development that threatens to adversely affect local communities, livelihoods, ecosystems, and the global climate—despite mounting political instability and violence in the Cabo Delgado region where the gas buildout is occurring.

19.    My CIEL colleagues and I have continued to engage DFC, through meetings with DFC staff on December 15, 2020 and March 31, 2021. At those meetings, we have expressed concern over the need to ensure that best practice and international standards on transparency, participation, and proper stakeholder engagement are incorporated into DFC's policies. In addition to the adoption of environmental and social governance standards at the new institution, CIEL also stressed that DFC's new accountability mechanism should maintain a higher level of transparency and disclosure of information, in line with best practice at other accountability mechanisms.

20.    Since the start of 2021, CIEL and partners have provided a series of policy recommendations for the DFC's new accountability mechanism outlining the need for robust commitments on transparency and the disclosure of information about the mechanism's

Garcia Zendejas Decl.
Page 8

procedures, operations, and cases. The lack of notice of DFC Board meetings, public access to

Board meetings, or minutes and/or transcripts of those Board meetings, hampers our ability to

pursue the adoption or implementation of our recommendations and to ensure that those affected

by OPIC's operations have access to information about, and opportunities for meaningful

participation in, its decision-making.

21.     In order to effectively carry out my role at CIEL, I need public notice of

upcoming DFC meetings and open access to those meetings and deliberations. I relied on proper

notice of and access to OPIC meetings in the past, as mandated by the Sunshine Act. As a

consequence of DFC's failure to abide the same law and requirements, I do not know when

meetings are happening, and am deprived of an opportunity to provide comments to the Board of

DFC and to relay questions on behalf of partners representing communities affected by DFC-

supported projects. This limits the dissemination of information to the public, and with it, the

institution's accountability both to the taxpayers that finance its activities and to the communities

affected by its operations.

22.     Having access to information about DFC projects under consideration and

approved as well as an opportunity to influence DFC decisions through public hearings enables

CIEL to further its mission by holding public institutions accountable to legal standards and

policies that protect the environment, promote human rights, and ensure a just and sustainable

society.

I declare under penalty of perjury that the foregoing is true and correct.

Dated this _27th_ day of May, 2021.

_____
Carla García Zendejas

Garcia Zendejas Decl.
Page 9

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, et al., | |
| Plaintiffs, | Civil Action No. 1:21-cv-1491-CRC |
| v. | |
| UNITED STATES INTERNATIONAL DEVELOPMENT FINANCE CORPORATION, | |
| Defendant. | |

**DECLARATION OF WILLIAM J. SNAPE, III**

I, William J. Snape, III, declare as follows:

1. The facts set forth in this declaration are based upon my personal knowledge. If called as a witness, I could and would testify to these facts.

2. I am the lead attorney in this case for Plaintiffs. I am senior counsel with the Center for Biological Diversity, and a professor and assistant dean at American University's Washington College of Law.

3. I was the attorney who coordinated the Declarations in support of Plaintiffs from Kate DeAngelis, Doug Norlen, Carla Zendejas, and Sarah Uhlemann. I hereby verify the validity of these Declarations.

4. I, along with other Plaintiffs' representatives, attended the June 9, 2021 public meeting on Zoom held by Defendant U.S. Development Finance Corporation (DFC).

5. The June 9 meeting, as well as earlier U.S. DFC meetings, did not comply with the requirements of the U.S. Sunshine Act.

6. Among other legal problems and/or violations, there were no transcript or minutes made available from the June 9 meeting (or previous meetings). The public meeting itself was very short, and consisted of opening statements by agency officials, and then statements from members of the interested public, including Plaintiffs.  There was no dialogue, no question-and-answer period, and no discussion about any project between the public and agency officials.

7. In addition, it appears decisions were made at the private DFC Board meeting on June 9 that were not even noted in the public notice and agenda of the DFC Board meeting. Compare Attachment C (public DFC meeting agenda) with Attachment D (DFC press release touting decisions made in the private DFC Board Meeting not covered or mentioned in the public meeting agenda).

8. Plaintiffs are not seeking injunctive relief at this time because they are hopeful this matter can be resolved quickly once a notice of appearance is filed by Defendant's counsel under the new administration. However, Plaintiffs are very concerned about significant DFC decisions being made without Sunshine Act compliance.

9. Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Signed:

_____

Dated: July 8, 2021

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, et al., <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES INTERNATIONAL DEVELOPMENT FINANCE CORPORATION, <br><br> Defendant. | Civil Action No. 1:21-cv-1491-CRC |

### SUPPLEMENTARY DECLARATION OF KATE DEANGELIS

I, Kate DeAngelis, declare as follows:

1. The facts set forth in this declaration are based upon my personal knowledge. If called as a witness, I could and would testify to these facts.

2. I am submitting this second declaration on behalf of myself, and Friends of the Earth United States (FOE). I am currently a member of FOE. I have also been a staff member of FOE since 2014 and am the organization's International Finance Program Manager. In this role, I specifically work on issues under the jurisdiction of the U.S. International Development Finance Corporation (DFC) and its predecessor, the Overseas Private Investment Corporation (OPIC). I have focused on these issues since 2015.

3.  My initial declaration was filed in conjunction with Plaintiffs' Opposition to Defendants' Motion to Dismiss.

4. In order to effectively do my job, I need public notice of upcoming DFC meetings and open access to those meetings and deliberations. The Sunshine Act mandates proper notice and access to DFC board meetings and materials as I experienced – and greatly relied on – at OPIC.

5. At the most recent DFC Board meeting on December 8, 2021, I, along with other Plaintiffs' representatives, attended the public portion of the Board meeting held via Webex.

6. The public meeting itself was very short, and consisted of opening statements by agency officials, and then statements from members of the interested public, including Plaintiffs. There was no dialogue, no question-and-answer period, and no discussion about any project between the public and agency officials.

7. No minutes or transcript of the December 8, 2021 Board meeting have been made public as the Sunshine Act would require. 5 USC Sec. 552b(f)(2). After the September 9, 2021 DFC Board meeting, an extremely brief and conclusory "summary" was published:

https://www.dfc.gov/sites/default/files/media/documents/Board%20Meeting%20Summary_September%202021.pdf

8. In addition, it appears decisions were made at the private DFC Board meeting on December 8 that were not contained in the public notice and agenda of the DFC Board meeting. Of concern are two climate harmful projects announced by the DFC *after* the Board meeting:

**i) Boosting transportation and entrepreneurship in India:** An up
to $250 million loan to Shriram Transport Finance Company (STFC) will fund the expansion of STFC's commercial (fossil fuel) vehicle finance program for micro, small and medium enterprises (MSMEs) in India.

**ii) Doubling down on support for energy access in Sierra Leone:** $50 million in political risk insurance for CEC Africa (Sierra Leone) Limited to support the development, construction, and operation of an approximately 83.5 megawatt (fossil fuel) power plant in Sierra Leone, a country with one of the lowest electricity access rates in the world. Political risk insurance builds upon DFC's $217 million loan committed in July 2021.

https://www.dfc.gov/media/press-releases/dfc-approves-21-new-investments-mobilizing-more-11-billion-tackle-development

Both these projects are of huge concern to FOE and the other Plaintiffs.  We have had no ability to discuss or influence these two decisions with the DFC or its Board.

9.  Neither of these two projects, *supra*, were noticed by DFC before the Board meeting, as the Sunshine Act would require:

https://www.dfc.gov/sites/default/files/media/documents/Board%20Meeting%20Notification_December%202021.pdf

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Signed: _____

Kate DeAngelis

Dated:  12/14/21